## UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

MARK JOHN,
  *Plaintiff,*

  v.                                      No. 3:22-cv-00007 (VAB)

WALMART STORE NO. 5294, et al,
  *Defendants.*

### RULING AND ORDER ON MOTION FOR SUMMARY JUDGMENT

Mark John ("Mr. John" or "Plaintiff") has sued Walmart Store No. 5294; Walmart Stores East, LP; and Walmart (collectively, the "Defendants"), seeking relief under 42 U.S.C. § 1981, alleging racial discrimination and retaliation in violation of 42 U.S.C. § 2000e, *et seq.* ("Title VII") against all Defendants. *See* Am. Compl. at ¶¶ 74–171, ECF No. 23 (May 26, 2022) ("Am. Compl."). He has also alleged common law tort claims of intentional infliction of emotional distress; negligent infliction of emotional distress; negligent hire, supervision, and retention; and breach of the covenant of good faith and fair dealing against Walmart Store No. 5294 and Walmart Stores East, LP. *See id.* at ¶¶ 172–93.

The Defendants have filed a motion for summary judgment and accompanying memorandum. Mot. for Summ. J., ECF No. 92 (Nov. 22, 2024) ("Mot."); Mem. in Supp., ECF No. 93 (Nov. 22, 2024) ("Mem.").

For the following reasons, Defendants' motion for summary judgment is **GRANTED in part** and **DENIED in part.**

Mr. John's claims under Title VII and 42 U.S.C. § 1981 alleging racial discrimination and all of his state law claims are dismissed. Only his Title VII claim for unlawful retaliation remains for trial.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Background

#### 1.  Applicable Legal Standard

The relevant facts are taken from Defendants' Local Rule 56(a)(1) Statement, ECF No. 97, and exhibits attached to the memorandum in support of the motion for summary judgment, ECF Nos. 94-1–94-11, and Plaintiff's Local Rule 56(a)(2) Statement, ECF No. 111, and accompanying exhibits, ECF Nos. 110, 113, 114, 119. *See* D. Conn. L. Civ. R. 56(a).

Any denials of facts in Plaintiff's Local Rule 56(a)(2) statement, however, must "be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial and/or (2) evidence that would be admissible at trial." Local Rule 56(a)(3). In the absence of such citations, the Court may "deem[ ] certain facts that are supported by the evidence admitted." D. Conn. L. Civ. R.56(a)(3); *see Dolan v. Select Portfolio Serv.*, No. 03-CV-3285, 2016 WL 3512196, at *1 n.4 (E.D.N.Y. June 22, 2016) ("Where a party either (i) admits or (ii) denies without citing to admissible evidence facts alleged in the opposing party's D. Conn. L. Civ. R.56.1 Statement, the Court shall deem such facts undisputed."); *see also Cashman v. Ricigliano*, No. Civ. 3:02CV1423(MRK), 2004 WL 1920798, at *1 n.2 (D. Conn. Aug. 25, 2004) (deeming facts in a Local Rule 56(a)(1) Statement admitted because the opposing party did not file a Local Rule 56(a)(2) Statement); *August v. Dep't of Corrections*, 424 F. Supp. 2d 363, 365 n.2 (D. Conn. 2006) (same); see also *Vt. Teddy Bear Co. v. 1-800 BEARGRAM Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (in adjudicating summary judgment, courts "must be satisfied that the citation to evidence in the record supports the assertion").

"Under Fed. R. Civ. P. 56(e), only admissible evidence may be used to resist a motion for summary judgment[.]" *Rohman v. New York City Transit Auth.*, 215 F.3d 208, 218 n.6 (2d Cir.

2000); *see, e.g.*, *McCloskey v. Union Carbide Corp.*, 815 F. Supp. 78, 81 (D. Conn. 1993) ("A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." (internal quotation marks omitted) (quoting *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986))); *A.D. v. Bd. of Educ. of City Sch. Dist. of City of New York*, 690 F. Supp. 2d 193, 216 (S.D.N.Y. 2010) ("[M]aterials submitted by a party in connection with a summary judgment motion must be 'made on personal knowledge.' This requirement is not satisfied by assertions made 'on information and belief[.]'" (citation and internal quotation marks omitted)). Only admissible evidence thus will be considered to establish undisputed facts.

While a court must not engage in "judicial evidence weighing," in ruling on a motion for summary judgment, *see Ketcham v. City of Mt. Vernon*, 992 F.3d 144, 149 (2d Cir. 2021), it is also not required to credit a non-moving party's "conclusory statement[s] that turn[] on an interpretation and inference to be drawn from underlying facts." *Wang v. Delphin-Rittmon*, 747 F.Supp.2d 336, 345 n.35 (D. Conn. 2024) (citing *Woods v. Newburgh Enlarged City Sch. Dist.*, 288 F. App'x 757, 759 (2d Cir. 2008); *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)). Therefore, statements without support evidence drawing conclusions about Defendants' motivations or stating without support that Defendants fabricated evidence will not be credited as facts for the purposes of summary judgment. *See, e.g.*, Pl's Rule 56(a)(2) Statement of Undisputed Facts at ¶ 8, ECF No. 111 ("Pl's SOF") (stating without citations to the record that "[e]thics also showed extreme negligence throughout the entirety of this investigation" and "willful ignorance to the behaviors and actions of Caucasian employees displays a blatant showing of DISCRIMINATION by [Defendants]").; *id.* at ¶ 10 ("Both Canales and Geloso fabricated their affidavits.").

But, even if there are some deficiencies in Mr. John's Rule 56(a)(2) statement, especially since he is a *pro se* litigant, the court is permitted to consider his submissions "to the extent they are properly supported by admissible evidence . . . in the record." *Watson v. Wheeler Clinic, Inc.*, No. 3:21-cv-00503-MPS, 2023 WL 5980003, *2 (D. Conn. Sept. 14. 2023) ("Because Watson is a pro se litigant, however, I have considered her submissions despite her failure to comply with the Local Rules, to the extent they are supported by admissible evidence that I could locate in the record.").

As a result, any facts in the Defendants' Local Rule 56(a)(1) statement are deemed admitted, to the extent that the facts are supported by the record.

## 2.   The Relevant Facts

Walmart initially hired Mr. John in May of 2017 as an Asset Protection Associate, a position he maintained for the duration of his employment, at all times based in the Milford, Connecticut store. Defs. Rule 56(a)(1) Statement of Undisputed Facts at ¶ 1, ECF No. 97 ("Defs. SOF"). Mr. John identifies "African American" and "Black." John CHRO Charge, ECF No. 94-10 at 3 (¶ 4) (Nov. 22, 2024) ("CHRO Charge").

He reported to the Milford store's Assistant Asset Protection Manager—initially Jason Risola and later Ronald Smith—who in turn reported to the Market Asset Protection Manager, Michael Geloso. Defs. SOF at ¶ 2. Mr. John's general responsibilities included patrolling the store, investigating potential shoplifting incidents, and preventing theft. *Id.* at ¶ 3.[1] As an Asset

---

[1] Mr. John notes in his Statement of Undisputed Facts that Defendants "narrowly define[d] and mischaracterize[d]" the duties of an Asset Protection Associate. Pl. SOF at ¶ 3. He provided the Court with a printout Walmart's description of the Asset Protection Associate, which he signed to indicate his understanding of the position on May 17, 2017, the date of his hiring. *See id.* (citing Pl's Exs., Section A at 1–3, ECF No. 10 (Apr. 21, 2025) ("Pl's Exs."). The detailed duties and competencies of the Asset Protection Associate are not material to Mr. John's federal or state claims.

Protection Associate, Mr. John did not have supervisory functions, such as having direct reports, or possessing the authority to hire, fire, discipline or evaluate other employees. *Id.* at ¶ 4.[2]

On September 13, 2017, Mr. Geloso issued a "coaching"—Walmart's terminology for a disciplinary write-up—to Mr. John for a an alleged "bad stop." *Id.* at ¶ 5. A "bad stop" is an apprehension of a customer that was not conducted in accordance with Walmart's policies. *Id.* Mr. Geloso specifically coached Mr. John on not having the element of "continuous observation" necessary to conduct a stop. *See* Pl.'s SOF at ¶ 5; John Dep. at 101:19–22, ECF No. 94-1 at 39 ("And I was extremely surprised, because he had me coached and it was for the elements that you had asked about before, and he said that I didn't have my element of continuous observation[.]").

Mr. John "open doored," or appealed, the disciplinary action, claiming that Mr. Risola had continuous observation of the customer and that the stop was made at his direction. *See* Pl.'s SOF at ¶ 5; *see also* John Dep. at 102:5–8 ("So the thing is that I knew I was not in the wrong, because as I said to you before all three of us during the situation were on the phone, and Jason was the observation from the camera. So it kind of bothered me because, you know, when you're doing your job and you're doing it correctly, to be accused of something like that is a fireable offense. So

---

[2] Mr. John cites to a print-out of Walmart's description of an "hourly supervisory," the duties of which include having direct reports, or hiring, firing, or evaluative authority. Pl. SOF at ¶ 4 (citing Section C at 3, Pl's Exs., ECF No. 110-1 (Apr. 21, 2025). That some positions within Walmart that contain the title of "supervisor" do not call for the "supervisory functions" described by Defendants is not material to Mr. John's claims of discrimination, retaliation, or related state law claims. Mr. John claims that Mr. Ron Smith in his deposition confirmed the supervisory role of Asset Protection Associates because customer hosts report to Asset Protection Associates in the event of thefts. *Id.* at ¶ 4 (citing Ronald Smith Dep., ECF No. 114 at 15 (Apr. 28, 2025)). Mr. Smith explained that customer hosts report directly to him as the Asset Protection Manager, but that "in [his] absence, the two APAs would be next in the . . . chain of command. So at least the customer host would report to the two APAs." Smith Dep., ECF No. 114 at 15 (Apr. 28, 2025). In Mr. John's deposition, he clarified that, rather than "maintenance employees, [] front door hosts, and [] self-checkout cashiers" directly reporting to the APAs as their supervisors, instead, APAs "coordinate" with that team to ensure "Cohesiveness." John Dep. at 54–55, ECF No. 94-1 at 16–17. Mr. John also notes that he completed an Hourly Supervisor Certification training, citing to affidavits of Mr. Charles Keeler and Ms. Melissa Trinidad. *See id.* at ¶ 4. But neither affidavit references Mr. John's completion of the training *See* Pl.'s Exs. at 5–8 (Keeler Aff.); Trinidad Aff., ECF No. 113 (Apr. 22, 2025).

for me I was kind of like, I don't understand why I'm getting coached for this."). After further investigation, Mr. Geloso rescinded the coaching. Defs. SOF at ¶ 5.

Sometime thereafter, Mr. Risola issued Mr. John a coaching for accepting and using a store coupon in violation of a company policy Mr. John claimed to know nothing about. *Id.* at ¶ 6.[3] Mr. John unsuccessfully pursued an "open-door" appeal of the coaching. *Id.* It is disputed whether these coachings were available on Mr. John's internal Walmart record. Defendants claim that the coachings were "wiped of his record after six months." Defs. SOF at ¶ 6 (citing John Dep. 128:19-23; Geloso Decl. ¶ 19). Mr. John claims that the coachings were still active, however, and he provided a print-out  of his employment record at Walmart, which mentions the coachings. *See* Pl.'s SOF at ¶ 6 (citing Pl's Exs. at 17–21, ECF No. 110).

In late 2018, Mr. John applied for open Asset Protection Manager positions in Hamden, Branford, and Milford. Defs. SOF at ¶ 9. Mr. Geloso also alerted Mr. John to an opening for an Asset Protection Manager position in New Milford and offered him an opportunity to interview. *Id.* The interviews for these positions were conducted by Mr. Geloso and Lauri Canales, the Market Human Resources Coordinator. *Id.*[4] For each position, Mr. Geloso and Ms. Canales selected a candidate with prior supervisory or managerial experience, which Mr. John did not possess. *Id.* at ¶ 10.[5]

---

[3] Mr. John provides the Court with a copy of one of Walmart's coupon policies. *See*

[4] Mr. John disputes that he was offered the opportunity to interview in New Milford. Pl's SOF at ¶ 9 (citing Geloso Aff. at ¶ 15, ECF No. 95 (Nov. 22, 2024). According to Mr. Geloso's affidavit, "[f]ollowing Mr. John's interviews for Hamden and Branford, I personally recommended to Mr. John that he should interview for the New Milford position and provided him with guidance to help prepare for the interview." Geloso Aff. at ¶ 9. However, "Mr. John also applied for the Asset Protection Manager position in Milford, his home store but Ms. Canales, Tuesday Wharton, the Store Manager, and I agreed he was not one of the top three candidates, so he was not granted an interview." *Id.* at ¶ 15. Mr. John's other factual disputes with Defendants' explanations regarding his interviews for an Asset Protection Manager position also appear to mistake his experience interviewing for a New Milford position with his experience being denied an interview for the Milford position. *See* Pl's SOF at ¶ 9.

[5] The Defendants wrote in their SOF that "Geloso and Canales selected a candidate with prior supervisory or managerial experience at Walmart," Defs. SOF at ¶ 10 (emphasis added), but Mr. John disputes this, noting that at least one of the candidates was an external hire. Pl's SOF at ¶ 10. The Court does not deem this dispute material to Mr. John's federal or state claims.

The Branford position went to Bettina Hernandez, a Hispanic female; the Hamden position was awarded to Araya Koonce, an African American woman; Angel Lopez, a Hispanic male, was selected for the New Milford position; and the Milford position, for which Plaintiff was not interviewed, went to Smith, a Caucasian male. *Id.* at ¶ 11. During the same time period, Walmart selected Willie Childs, an African American man, to fill an opening for an Asset Protection Manager position in Shelton, a position that was not posted externally. *Id.* Mr. John never applied for the position in Shelton. *See* Geloso Aff. at ¶ 17; Lauri Canales Aff. at ¶ 16, ECF No. 96 (Nov. 22, 2024).

In February 2019, Tuesday Wharton, the Store Manager in Milford, coached Mr. John at Mr. Geloso's direction for another alleged "bad stop." Defs. SOF at ¶ 7. Mr. John challenged—or "open doored"—the coaching, asserting that his manager, Ronald Smith, was responsible for the stop. *See id.* In a March 20, 2019 e-mail to Anthony Williams, the Northeast Senior Director of Asset Protection, about his "open door," Mr. John wrote of the incident, "[t]his is the 2nd time that [] Mike Geloso has wrongfully accused and coached me for a BAD STOP. The person who made the stop was my [manager] Ronald Smith, who happens to be a CAUCASIAN male. . . . I believe the actions taken by [Mr.] Geloso that he for some reason is once against PROTECTING a person of his own race and a friend of his. A similar situation happened with the same way with my previous [manager] Jason Risola." Pl's Exs, at 39, ECF No. 110. After investigation, the coaching was rescinded. Defs. SOF at ¶ 7.

Following Mr. John's March 2019 e-mailed complaint about Mr. Geloso, an investigation was conducted by Walmart Ethics. *Id.* at ¶ 8. The ethics investigators determined in May 2019 that Mr. John's allegations against Mr. Geloso were unsubstantiated. *Id.*[6]

---

[6] Mr. John disputes that his allegations were "unsubstantiated," pointing out that the investigation found that Mr.

On July 17, 2019, Mr. John filed a charge of discrimination, harassment, and retaliation with the Connecticut Commission on Human Rights and Opportunities ("CHRO") and the U.S. Equal Employment Opportunity Commission ("EEOC") against his employer. *See* Defs. SOF at ¶ 17; Pl's SOF at ¶ 17; CHRO Charge at 3.

The charge alleged that the previous year Mr. John's supervisor Mr. Risola, who is white, was accused of racially profiling a customer. CHRO Charge at 3 (¶ 13). Mr. John alleged that Mr. Geloso, the manager, who is also white, chose to discipline Mr. John rather than Mr. Risola. *Id.* at 3–4 (¶¶ 9, 13, 14). The charge also alleged that Mr. Geloso chose not to interview Mr. John for a position to which he had applied and for which he was allegedly qualified. *Id.* at 4 (¶¶ 15-17). Mr. Geloso allegedly chose to instead hire Mr. Smith, who is white and had been accused of sexual misconduct in the past. *See id.* at ¶¶ 18–20. Mr. Smith allegedly incorrectly stopped a customer in February 2019, yet Mr. Geloso allegedly instructed the store manager, Tuesday Wharton to discipline Mr. John rather than Mr. Smith. *Id.* at ¶¶ 21–22.

Mr. John alleged to the CHRO that, following the Ms. Wharton's viewing of the surveillance video from the incident, she acknowledged that she should not have disciplined Mr. John. *Id.* at ¶¶ 23–24. Mr. John alleged that, he requested an investigation into the "systemic bias towards African Americans" in the asset protection division. *Id.* at ¶ 26. Mr. John alleged that no one had reached out to him regarding the investigation's findings, but that Mr. Geloso informed him that the written warnings he complained about had been removed. *Id.* at ¶¶ 27–28. Mr. John

---

Geloso had not followed proper procedures when investigating the February 2019 stop. *See* Pl's SOF at ¶ 8. The investigation found that Mr. Geloso had not "review[ed] documentation" of the incident "prior to recommending coaching for APA Mark." Pl's Exs. at 48, ECF No. 110 (e-mail from Walmart Ethics and Compliance Manager re findings of Geloso investigation). Walmart's ethics and compliance department recommended that Mr. Geloso's supervisors "have a conversation with Mike to ensure that he is following process as it relates to accountability." *Id.* That is, while the investigation determined that Mr. Geloso had not retaliated against Mr. John or discriminated against him based on race, it recommended that Mr. Geloso's supervisors have a "conversation" with him "about following all procedures and policies before delivering accountabilities to associates." Pl's Exs. at 1, ECF No. 110-1 (findings of ethics investigation).

alleged to the CHRO that he was subjected to illegal discrimination and retaliated against for complaining about the discrimination. *Id.* at ¶ 20.

In March 2020, Mr. John commenced medical leave due to a knee injury that rendered him unable to walk for extended periods of time, an essential function for his job. Defs. SOF at ¶ 12. On August 8, 2020, Walmart issued Mr. John an "end of leave" letter, informing him that his leave had expired on June 23, 2020, and that, if he failed to take action within three days of receiving the letter, his employment may be considered to have been voluntarily terminated. Defs. SOF at ¶ 13. Defendants allege that, in the interim, Mr. John made no effort to obtain employment at Walmart, and instead was "waiting for them to get back to [him]." *Id.* at ¶ 14 (citing John Dep. 83:21–84:6; 90:17-19) (alteration in original). On August 21, 2020, Walmart updated Mr. John's record to reflect he had voluntarily terminated his employment. *Id.* at ¶ 15. Walmart claims that it was not until after Mr. John was terminated that they began searching for his replacement, and eventually filled his position in November 2020. *Id.* at ¶ 16.

Mr. John added additional details in his Statement of Undisputed Facts and his deposition. On June 18, 2020, Mr. John returned to Walmart and was told that the personnel coordinator, Sophia Cantore, needed to speak with the store management, Joseph Kilcoyne, in order for Mr. John to be put back on the schedule and receive hours. John Dep. at 79:17–80:2; *see also id.* at 73:20–22. Mr. John later received a call from Ms. Cantore letting him know that an offer letter had been sent to another person for Mr. John's position and that he would "now have a certain amount of days to find a job in the store I wanted." *Id.* at 80:4–16; *see also id.* at 73:22–24; *id.* at 84:13 – 15 ("Sophia said that it was filled - - Mike Geloso filled the position and that she would get back to me on Laurie [sic]."). Mr. John was also told by Ms. Cantore around that time that Ms. Canales

would not speak with him about his position because he was already represented by counsel. *Id.* 82:5–10.

After receiving notice of his impending voluntary termination in August 2020, Mr. John continued calling regarding returning to work until December 2020, at which point he was told by the new personnel coordinator—as Ms. Cantore had been promoted—that returning to Walmart would be impossible, and he filed for unemployment. *Id.* at 82:12–83:9. Between June and December, Mr. John made efforts to get in contact with Mr. Geloso, although he did not call or e-mail him, but was told by personnel employees that he would not be able to speak to Mr. Geloso because Mr. John was already represented by counsel. *Id.* at 85:21–86:11.

Mr. John has not filed any CHRO or EEOC complaints since the complaint filed on July 17, 2019. Defs. SOF at ¶ 18.

### B. Procedural History[7]

On January 3, 2022, Mr. John filed a Complaint against all Defendants. Compl., ECF No. 1 (Jan. 3, 2022).

On April 14, 2022, Defendants filed a motion to dismiss. Mot. to Dismiss, ECF No. 14 (Apr. 14, 2022).

On May 26, 2022, Mr. John filed an Amended Complaint. Am. Compl.

On July 14, 2022, Defendants filed a second motion to dismiss. Mot. to Dismiss, ECF No. 29 (July 14, 2022).

On December 1, 2022, Mr. John filed a response to the second motion to dismiss. Resp. re Mot. to Dismiss, ECF No. 33 (Dec. 1, 2022).

---

[7] The summary below recounts the procedural history as directly relevant to the motion for summary judgment. The discovery motions practice between the parties has been extensive but is not directly relevant to the review of this motion.

On February 2, 2023, the Court denied Defendants' motions to dismiss without prejudice to renewal in the form of a motion for summary judgment. Order, ECF No. 43 (Feb. 2, 2023).

On November 22, 2024, Defendants filed a motion for summary judgment and a memorandum in support of that motion, Mot., Mem., along with their statement of material facts, Statement of Material Facts, ECF No. 97 (Nov. 22, 2024) ("Defs. SOF").

On November 25, 2024, the Court issued an order taking notice of the tragic passing of Richard C. Gordon, counsel for Mr. John, and stayed the deadline for any response to the motion for summary judgment pending replacement counsel for Mr. John or Mr. John moving to represent himself. Order, ECF No. 98 (Nov. 25, 2024).

On December 23, 2024, Mr. John filed an appearance as a self-represented party. Appearance by Self Rep. Party, ECF No. 99 (Dec. 23, 2024).

On April 22, 2025, Mr. John filed a memorandum in opposition to the motion for summary judgment. Opp'n to Mot. for Summ. J., ECF No. 112 (Apr. 22, 2025) ("Opp'n). He also filed a response to the Defendants' statement of material facts. Pl.'s SOF.

On May 30, 2025, Defendants filed a reply memorandum in further support of their motion for summary judgment. Reply in Supp. of Mot. for Summ. J., ECF No. 117 (May 30, 2025) ("Reply").

## II.    STANDARD OF REVIEW

A court will grant a motion for summary judgment if the record shows no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The non-moving party may defeat the motion by producing sufficient evidence to establish that there is a genuine issue of

material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48.

"[T]he substantive law will identify which facts are material." *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*; *see Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("[M]ateriality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." (citing *Anderson*, 477 U.S. at 248)).

"The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. When a motion for summary judgment is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the non-moving party must do more than vaguely assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (internal quotation marks omitted).

The party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.* (internal quotation marks omitted). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 250 (citing *Dombrowski v. Eastland*,

387 U.S. 82, 87 (1967); and *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)).

A court must view any inferences drawn from the facts in the light most favorable to the party opposing the summary judgment motion. *See Dufort v. City of New York*, 874 F.3d 338, 343, 347 (2d Cir. 2017) ("On a motion for summary judgment, the court must 'resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.'"). A court will not draw an inference of a genuine dispute of material fact from conclusory allegations or denials, *see Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011), and will grant summary judgment only "if, under the governing law, there can be but one reasonable conclusion as to the verdict," *Anderson*, 477 U.S. at 250.

Furthermore, *pro se* filings "must be construed liberally and interpreted to raise the strongest arguments that they suggest." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F. 3d 471, 474 (2d Cir. 2006)) (internal quotation marks omitted); *see also Tracy v. Freshwater*, 623 F. 3d 90, 101–02 (2d Cir. 2010) (discussing the "special solicitude" courts afford pro se litigants). While *pro se* filings must be construed "liberally" and "read to raise the strongest arguments they suggest," the Court cannot "read into *pro se* submissions claims that are not consistent with the pro se litigant's allegations." *See Triestman*, 470 F.3d at 476 (internal quotation marks omitted).

## III.    DISCUSSION[8]

Defendants argue that summary judgment should be granted against Mr. John's federal discrimination and retaliation claims in their entirety because (1) Mr. John failed to exhaust

---

[8] Much of Mr. John's opposition brief focuses on allegations related to Mr. Smith's behavior toward women and toward Mr. John's alleged girlfriend, Ms. Trinidad. Neither Ms. Trinidad nor Mr. Smith are parties to this suit, as such, the Court will only consider those allegations when they are directly relevant to Mr. John's claims against his previous employers.

administrative remedies as to his Title VII claims; (2) he cannot prove that the "coachings" he received are actionable under Title VII; (3) Mr. John cannot demonstrate an inference under the *McDonnell-Douglas* framework that he was denied promotions based on his race or as an act of retaliation; and (4) Mr. John presents no material facts to demonstrate that his termination was motivated by discrimination or retaliation. Defendants also argue that because the state law claims are premised on the same non-actionable facts as the discrimination claims, the state claims, too, must be granted summary judgment.

The Court will address each argument in turn.

### A.  The Exhaustion of Administrative Remedies

"Before bringing a Title VII suit in federal court, an individual must first present 'the claims forming the basis of such a suit ... in a complaint to the EEOC or the equivalent state agency.'" *Littlejohn v. City of New York*, 795 F.3d 297, 322 (2d Cir. 2015) (quoting *Williams v. N.Y.C. Hous. Auth.*, 458 F.3d 67, 69 (2d Cir. 2006) (per curiam); *Kelly v. N. Shore–Long Island Jewish Health Sys.*, 166 F. Supp. 3d 274, 288 (E.D.N.Y. 2016) ("The ADA requires that a plaintiff exhaust all available administrative remedies before filing an employment discrimination action.").

Federal courts will consider allegations that reasonably relate to the discrimination claims submitted to the administrative agency. *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 177 (2d Cir. 2005) ("Thus, [w]e have recognized ... that claims that were not asserted before the EEOC may be pursued in a subsequent federal court action if they are reasonably related to those that were filed with the agency.") (*quoting Legnani v. Alitalia Linee Aeree Italiane, S.P.A.*, 274 F.3d 683, 686 (2d Cir. 2001) (per curiam) (internal quotation marks omitted)). "Reasonably related conduct is that which 'would fall within the scope of the EEOC investigation which can

reasonably be expected to grow out of the charge that was made.'" *Id.* (quoting *Fitzgerald,* 251 F.3d at 359-60).

Defendants argue that Mr. John has failed to administratively exhaust his claims against Walmart for anything other than the specific allegations listed in his charge to the CHRO. *See* Mem. at 6. They argue that Mr. John alleged "race discrimination and/or retaliation connection with the initial 'bad stop' coaching administered by Geloso and the denial of a promotion to the position of Asset Protection Manager in Milford." *Id.* Defendants argue that none of Mr. John's other claims were the subjects any CHRO charges, and are not reasonable related to his only filed charge. *Id.*

The Court disagrees.

A court may hear only those Title VII claims "that either are included in an EEOC charge or are based on conduct subsequent to the EEOC charge which is 'reasonably related' to that alleged in the EEOC charge." *Butts v. City of New York Dep't of Hous. Pres. & Dev.*, 990 F.2d 1397, 1401 (2d Cir. 1993) (citation omitted), *superseded by statute on other grounds.* The Second Circuit has recognized several types of situations "where claims not alleged in an EEOC charge are sufficiently related to the allegations in the charge that it would be unfair to civil rights plaintiffs to bar such claims in a civil action," and has "loosely referred to these claims as 'reasonably related' to the allegations in the EEOC charge." *Butts*, 990 F.2d at 1402. The defense arises from a recognition that "EEOC charges frequently are filled out by employees without the benefit of counsel...." *Id.*

Subsequent conduct is reasonably related to conduct in an EEOC charge if: "[1] the claim would fall within the reasonably expected scope of an EEOC investigation of the charges of discrimination; [2] it alleges retaliation for filing the EEOC charge; or [3] the plaintiff 'alleges

further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge.'" *Alfano v. Costello*, 294 F.3d 365, 381 (2d Cir. 2002) (quoting *Butts*, 990 F.2d at 1402–03).

Although Mr. John's opposition brief is not a model of clarity, he appears to argue that the job removal was partially in retaliation for his complaints against Mr. Geloso, therefore invoking the first and second *Butts* exception. For instance, he seems to allege a connection between the EEOC charge and the allegedly irregular process surrounding his termination. *See* Pl's SOF at ¶ 14 ("Plaintiff contacted personnel on numerous occasions, but was improperly denied communication due to Plaintiff being represented by legal counsel at that time. However, Sophia Cantore of Human Resources falsely stated that HR could not speak with Plaintiff even though plaintiff's CHRO complaint had no connection to his return-to-work-inquiry. Walmart therefore wrongfully denied plaintiff access to HR assistance."). "Generally, claims of both retaliation and wrongful termination postdating the submission of an EEOC charge are excepted from the requirement that the claim must first have been made in the EEOC charge." *Ibraheem v. Wackenhut Servs., Inc.*, 29 F.Supp.3d 196, 208 (E.D.N.Y. 2014) (citing *Joseph v. Price Costco*, 100 Fed. App'x. 857, 857–58 (2d Cir. 2004) (summary order) (citing *Butts*, 990 F.2d at 1402–03)) (finding "Plaintiff's claims related to retaliation and his termination" justiciable even though those claims post-dated his EEOC complaint).

Accordingly, the Court will not dismiss Mr. John's Title VII claims for failure to exhaust administrative remedies, and will proceed to considering his claims on the merits.

### B.  The Title VII Race Discrimination Claims

Title VII makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of

employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

The same analysis applies to both Title VII and 42 U.S.C. § 1981claims: the three-step burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *Sanchez v. Conn. Nat. Gas Co.*, 421 Fed. Appx. 33, 34 n.2 (2d Cir. 2011) ("Although *McDonnell Douglas* concerned the burden and allocation of proof under Title VII, its framework is also applied to claims under 42 U.S.C. § 1981.").

Under this burden-shifting framework, the plaintiff employee must first present a *prima facie* case by establishing:

> (1) that he belonged to a protected class; (2) that he was qualified for the position he sought; (3) that he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent.

*Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 251-52 (2d. Cir. 2014) (citing *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008)).

After the plaintiff meets this "initial burden," then it becomes the employer's burden to establish a legitimate nondiscriminatory reason for its actions; "the final and ultimate burden is on the plaintiff to establish that the defendant's reason is in fact pretext for unlawful discrimination." *Id.* at 251 (citing *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 446 (2d Cir. 1999)); *see also Sista v. CDC Ixix N.A., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006) (emphasizing "admissible evidence" in a disability discrimination case (citation omitted))*; Terry v. Ashcroft*, 336 F.3d 128, 137–38, 140–41 (2d Cir. 2003) (in the Title VII race and gender discrimination and retaliation contexts (citation omitted)).

Mr. John claims that Defendants discriminated against him on the basis of his race and color, in violation of 42 U.S.C. § 1981 and Title VII, when they issued two coachings that were

17

later rescinded, when he was coached for using a coupon in violation of Walmart's policy, and

when he was not hired for any of the Asset Protection Manager Positions for which he applied.

Walmart has moved for summary judgment on all of Mr. John's claims.

The Court will address each aspect of the alleged claims in turn.

### 1. The Coachings

An adverse employment action is any action that causes the Plaintiff to "endure[ ] a

materially adverse change in the terms and conditions of employment ... [and a] materially

adverse change is one that has an attendant negative result, a deprivation of a position or an

opportunity." *Gutierrez v. City of N.Y.*, 756 F.Supp.2d 491, 506 (S.D.N.Y. 2010) (citations and

internal quotation marks omitted).

Defendants argue that Mr. John does not allege, nor does he provide any supporting

evidence, that the coachings had any impact on the terms or conditions of his employment. Mot.

at 9. They argue that "[r]ather, plaintiff surmised that because the coachings still appear on his

record even after they were rescinded or dropped off, they are an impediment to advancement."

*Id.* They point out that, under Walmart policy, "once a coaching becomes inoperative . . . it has

no bearing on the coached employee's compensation, status, eligibility for transfer or promotion,

or any other aspect of his or her employment." *Id.* (citations omitted). Defendants point out that

Mr. John was actually interviewed for several promotional opportunities after the coachings—

and other candidates were chosen because of their experience, rather than because of Mr. John's

disciplinary history. *See id.* In their view, Mr. John fails to provide evidence that the coachings

were either discriminatory adverse actions or retaliatory. *See id.* 8–10 (citing, *inter alia*,

*Muldrow v. City of St. Louis*, 601 U.S. 346, 354 (2024); *Moll v. Telesector Resources Group,*

*Inc.*, 94 F.4th 218, 239 (2d Cir. 2024)).

The Court agrees.

In *Muldrow*, the Supreme Court held that to constitute an "adverse action," a plaintiff "need show only some injury respecting her employment terms or conditions. The [adverse action] must have left [him] worse off, but need not have left [him] significantly so." 601 U.S. at 359; *see also Mitchell v. Planned Parenthood of Greater New York, Inc.*, 745 F.Supp.3d 68, 90 (S.D.N.Y. 2024) ("Although *Muldrow* directly concerned a transfer, its reasoning relies on the language of Title VII's anti-discrimination provision rather than anything special about transfers. Thus, the Court holds that *Muldrow* applies to Title VII discrimination cases not involving transfers." (citing *Peifer v. Bd. of Prob. & Parole*, 106 F.4th 270, 277 (3d Cir. 2024) (applying *Muldrow* to non-transfer case); *Cole v. Grp. Health Plan, Inc.*, 105 F.4th 1110, 1114 (8th Cir. 2024) (same); *Williams v. Memphis Light, Gas & Water*, No. 23-5616, 2024 WL 3427171, at *5-6 (6th Cir. July 16, 2024) (same); *Riggs v. Akamai Techs.*, No. 23-cv-06463 (LTS), 2024 WL 3347032, at *6 (S.D.N.Y. July 8, 2024) (same))).

While Mr. John argues that, "[c]oachings that expired, deleted, and canceled still remain on an associate's disciplinary record like a Scarlet Letter," Pl.'s SOF at ¶ 6 (citing Pl's Exs. at 17–21, ECF No. 110), he does not allege or provide any evidence to support his allegation of being "left worse off" because of these coachings. Furthermore, as Defendants point out, Mr. John was interviewed for several promotion opportunities after receiving coachings for both the 2017 "bad stop"—which was rescinded—and for using store coupons—a coaching that was not rescinded. Defs. SOF at ¶ 6. He did not obtain those positions, but the two officials on his hiring committee, Ms. Canales and Mr. Geloso, testified that other candidates were chosen because of their supervisory experience, not because Mr. John had been subjected to past coachings. *See* Defs. SOF at ¶ 10.

In the absence of evidence of a discriminatory adverse action as to the coachings, Mr. John is unable to meet the higher standard to demonstrate that the coachings were retaliatory. *See Muldrow*, 601 U.S. at 357 ("[T]he [anti-retaliation] provision [of Title VII] applies only when the retaliatory action is 'materially adverse,' meaning that it causes 'significant' harm." (citing *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 68 (2006))). Thus, there is no dispute of material fact as to whether Mr. John was left "worse off" by the coachings referenced in the allegations—let alone whether the coachings caused him "significant harm."

Accordingly, summary judgment will be granted as to any of Mr. John's Title VII and Section 1981 race discrimination claim related to his alleged coachings.

### 2.  The Failures to Promote or Hire

Under Title VII, "[a]n employment decision ... violates Title VII when it is based in whole or in part on discrimination." If the plaintiff establishes a *prima facie* case under *McDonnell Douglas*, the burden shifts to his employer, who must show a "legitimate, nondiscriminatory reason" for the challenged promotion. See *McBride v. BIC Consumer Prod. Mfg. Co.*, 583 F.3d 92, 96 (2d Cir. 2009). Once an employer puts forth a nondiscriminatory reason, the burden shifts back to the plaintiff to show that the offered reason is a mere "pretext" for unlawful discrimination. *See id.*

Defendants appear to concede that Mr. John can establish a *prima facie* case of race discrimination for their failure to hire him for the various Asset Protection Manager positions. *See* Mot. at 12 ("The burden at [the *prima facie*] state 'is not onerous.'" (citing *Bart v. Golub Corp.*, 96 F.4th 566, 569 (2d Cir. 2024)). Defendants argue that they successfully put forward a "legitimate, non-discriminatory reason" for choosing other candidates for those positions, however, and that Mr. John cannot establish that their decisions were mere "pretext" for

unlawful discrimination. *See id.* Furthermore, Defendants argue that Mr. John cannot establish a *prima facie* case that the hiring decisions were retaliatory because the hiring decisions at issue were all made before Mr. John raised a complaint of discrimination with Walmart or filed a CHRO complaint. *Id.* at 13 (citing *Robinson v. De Niro*, 739 F.Supp.3d 33, 89 (S.D.N.Y. 2023) ("Adverse action that preceded protected activity cannot be adverse action taken because of protected activity.")).

The Court agrees.

In cases where the plaintiff can establish a *prima facie* case of discrimination, district courts adopt "a temporary 'presumption' of discriminatory motivation[.]" *Littlejohn*, 795 F.3 at 307. An employer can rebut this presumption, however, "'with admissible evidence of a legitimate nondiscriminatory reasons for its adverse employment decision.'" *Martinez v. City of Stamford*, No. 3:20-cv-00174 (JCH), 2022 WL 824638, at *4 (D. Conn. March 17, 2022) (citing *Howley v. Town of Stamford*, 217 F.3d 141, 150 (2d Cir. 2000)). This is not a demanding standard, however, *id.* (citing *Bickerstaff*, 196 F.3d at 446), and employers, "'need not *prove* the absence of discriminatory motive or the [adverse employment decision] was motivated by a legitimate reason.'" *Id.* (emphasis and alteration in original) (quoting *Meiri v. Dacon*, 759 F.2d 989, 996 n.11 (2d Cir. 1985)). Employers need only articulate "'legitimate nondiscriminatory reasons [that are] clear and specific.'" *Id.* (quoting *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 132 (2d Cir. 2012) (alterations in original).

When an employer offers evidence of a nondiscriminatory reason for the adverse employment action, the plaintiff must "offer direct evidence of an improper discriminatory bias" or "defeat summary judgment on the strength of [her] prima facie case combined with circumstantial evidence that the [employer's] stated reason for failing to hire [the plaintiff] is

pretext." *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 102 (2d Cir. 2001), *superseded in part on other grounds by* Fed. R. Civ. P. 37(e).

Here, regarding whether Defendants' failure to hire Mr. John for the manager position was impermissibly motivated by discriminatory intent, Defendants offer a non-discriminatory reason for their hiring decisions: "[i]n each instance, Geloso and Canales selected a candidate with prior supervisory or managerial experience at Walmart, experience plaintiff did not possess." Defs. SOF at ¶ 10 (citing John Dep. 54:19-55:9; Canales Dep. 15:22-16:11; Geloso Aff. ¶¶ 10,14,16; Canales Aff. ¶¶ 9,13, 15).

Mr. John argues that the affidavits on which Defendants rely were fabricated. More specifically, he argues that Mr. Geloso and Ms. Canales fabricated their affidavits regarding the racial makeup of the candidates hired for the Asset Protection Manager jobs. Pl.'s SOF at ¶ 11. But there is no admissible evidence, however, supporting Mr. John's false testimony argument. At this stage of the case, Mr. John "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." *Brown*, 654 F.3d at 358 (citations and internal quotation marks omitted).

As to his alleged lack of supervisory experience for any of these roles, Mr. John offers affidavits from Ms. Trinidad and another colleague, Charles Keeler, to "confirm that successful completion of [Walmart] academy training resulted in appointment to supervisory roles." Pl's SOF at ¶ 10. Ms. Trinidad wrote, "I successfully passed the Academy for the Position of Asset Protection Associate (APA) along with receiving a certificate as an Hourly Supervisor." Trinidad Aff. at ¶ 5.  Mr. Keeler wrote, "[w]hile I was employed by Walmart, I worked as an Asset Protection Associate. A position that was also an hourly supervisor. Associates that I supervised

were customer hosts, self-checkout associates, maintenance and asset protection associates I trained." Keeler Aff. at ¶ 5.

Neither of these affidavits address, however, whether Mr. John had the necessary level of supervisory or managerial experience for these positions, or whether Mr. John's alleged supervisory or managerial experience was comparable to the supervisory or managerial experience possessed by the other candidates ultimately hired. Indeed, Mr. John provides no record evidence whatsoever regarding his qualifications compared with four out of the five candidates who were selected as Asset Protection Managers in the relevant stores in 2018. *See* Pl.'s SOF at ¶ 11. As to the fifth candidate, Araya Koonce, Mr. John provides her employment application from 2012, *see* Pl's Exs. at 7, ECF No. 110-2 (Koonce Application for Employment), and that application lists only experience as a cashier at CVS before Walmart, and not her supervisory experience.

But Ms. Canales clarified that Ms. Koonce did have relevant supervisory and managerial experience:

> Q: Okay. Do you recall why you selected her over Mr. John?
>
> A: She had various experience throughout operations. At least we were interested in her experience and felt that she would be able to do well in the position.
>
> Q: How do you define operations?
>
> A: So, we define anyone that works under the store as operations. So, she had managerial experience in the store over the front end. So, she was familiar with some of the protocol of the front end. She had also worked in the electronics department as a department manager, and then she had academy training and was a trainer for all of the facilities in Connecticut.

Reply at 3 (quoting Canales Dept. at 25). As a result, there is no genuine issue of fact as to whether each of the candidates hired instead of Mr. John had more relevant supervisory or managerial experience than him. On this record, each of them did.

He also argues that one of the APM jobs—in Shelton, Connecticut, for which Mr. Geloso and Ms. Canales ultimately selected Willie Childs, an African American man—cannot be used to support Defendants' case because the position was never posted to external candidates and he never applied for the position. *Id.* That a job was never offered to any external candidate does not meet the burden to demonstrate that Defendants' reason for giving the job to Mr. Childs over Mr. John was pretextual. *See, e.g.*, *Gaffney v. Dep't of Info. Tech. & Telecomm.*, 536 F. Supp. 2d 444, 467 (S.D.N.Y.) ("Even assuming that Defendants' proffered reason was false, Stewart still has the burden of establishing that Defendants' real reason for not hiring him was on account of unlawful discrimination. Stewart again asserts that Defendants' alleged preselection establishes that the proffered reason was merely a pretext for discrimination, but as the Court stated above, under these circumstances, preselection alone does not sufficiently establish by a preponderance of the evidence that unlawful discrimination was Defendants' real reason. Accordingly, Stewart has not met his burden of establishing that Defendants' nondiscriminatory reason for failing to hire him as an MCO was merely pretext for unlawful discrimination." (citations omitted)).

Significantly, in addition to the hiring of Mr. Childs, Defendants hired another African American person for one of the positions instead of Mr. John: Ms. Koonce in Hamden. *See id.* ("[E]ven assuming that this [failure to hire] took place, it would not reflect [] racial . . . discriminatory animus on the part of Defendants. Butler–Aleyande is a [B]lack male, and thus within Stewart's protected racial classification.").

24

As a result, Mr. John has failed to create a genuine issue of fact that the Defendants' decision not to promote him to Asset Protection Manager was pretextual.

Accordingly, summary judgment will be granted as to Mr. John's Title VII and Section 1981 claims related to the failure to hire or promote him for any Asset Protection Manager positions in 2018.

### C.  The Title VII Retaliation Claims

"In adjudicating retaliation claims, courts follow the familiar burden-shifting approach of *McDonnell Douglas Corp.*" *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010). The plaintiff employee must first establish a *prima facie* case by showing: (1) the employee engaged in an activity protected by Title VII; (2) the employer was aware of this activity; (3) the employer took adverse action against the employee; and (4) a causal connection exists between the alleged adverse action and the protected activity. *See Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (citing *Cifra v. G.E. Co.*, 252 F.3d 205, 216 (2d Cir. 2001)).

"A causal connection in retaliation claims can be shown either (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Natofsky v. City of New York*, 921 F.3d 337, 353 (2d Cir. 2019) (internal quotations omitted) (citing *Littlejohn*, 795 F.3d at 319; *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)). If a plaintiff satisfies this initial burden, "a presumption of retaliation arises." *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (citation omitted).

Next, "the employer must offer through the introduction of admissible evidence a legitimate nondiscriminatory reason for the discharge; and the plaintiff must then produce

evidence and carry the burden of persuasion that the proffered reason is a pretext." *See McBride v. BIC Consumer Prods. Mfg. Co., Inc.*, 583 F.3d 92, 96 (2d Cir. 2009) (citing *Sista*, 445 F.3d at 169). "The proper question for a retaliation claim is whether the alleged adverse action to which the plaintiff was subjected could well have dissuaded a reasonable employee in his position from complaining of unlawful discrimination." *Davis-Garrett v. Urban Outfitters, Inc.*, 921 F.3d 30, 44 (2d Cir. 2019) (citing *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)). Finally, "Title VII retaliation claims must be proved according to traditional principles of but-for causation." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S.Ct. 2517, 2534 (2013).

Mr. John argues that his termination was in retaliation for his complaints of racial discrimination on the part of his supervisors. Opp'n at 9–10. He argues that Defendants violated their own end-of-leave policy by failing to send him an end-of-leave letter prior to the end of his medical leave; by hiring his replacement prior to his voluntary termination; and, in their August 2020 letter, seemingly ignoring that he had reported to work before the end of his medical leave in June—all of which indicate a retaliatory motivation. *See id.*; *see also Sykes*, 723 F.3d at 403 ("[*Pro se* filings] must be construed liberally and interpreted to raise the strongest arguments that they suggest.").

Defendants argue that Mr. John cannot demonstrate a causal connection between his protected activity—the internal complaints and CHRO charge—and his termination.[9]  Mot. at 15. Defendants argue that the termination in August 2020 took place over a year after Mr. John's protected activity in July 2021, and that, therefore he cannot demonstrate a causal connection between the protection activity and the termination. *Id.* (citing *Farooq v. City of New York*, No.

---

[9] Defendants appear to concede that Mr. John can meet the other three prongs of the *prima facie* test. *See* Mot. at 15 ("Plaintiff fares no better with his retaliatory discharge claim. Indeed, as to this claim plaintiff cannot even make the requisite prima facie showing of a causal connection between his protected activity and the challenged adverse employment action.").

20-3185, 2022 WL 793117, at *4 (2d Cir. March 16, 2022) (affirming dismissal of retaliation claim, reasoning that a "five-month temporal gap here, standing alone, is insufficient to plead causation."); *Miceli v. Mehr*, No. 3:17-cv-00029, 2019 WL 5727387, at *15-16 (D. Conn. Nov. 5, 2019) ("the time gap of almost ten months between the CHRO complaint and his termination fail to establish an indirect causal connection through temporal proximity"), *aff'd*, 830 F. App'x 63 (2d Cir. 2020))).

The Court disagrees.

"The causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action." *Cifra v. Gen. Elec. Co.,* 252 F.3d 205, 217 (2d Cir.2001) (internal quotation marks omitted); *see also Treglia v. Town of Manlius,* 313 F.3d 713, 720 (2d Cir. 2002) ("We have held that a close temporal relationship between a plaintiff's participation in protected activity and an employer's adverse actions can be sufficient to establish causation."). But "'there is no bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship' between protected activity and 'an allegedly retaliatory action.'" *Watson*, 2023 WL 5980003, *21 (D. Conn. Sept. 14, 2023) (citing *Abrams v. Dept. of Pub. Safety*, 764 F.3d 244, 254 (2d Cir. 2014)) (also collecting cases). The plaintiff's burden to establish a *prima facie* case of retaliation is "'***de minimis***' and 'the court's role in evaluating a summary judgment requires is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Hicks*, 593 F.3d at 164 (emphasis in original) (citing *Jute v. Hamilton Sundstrand Corp.,* 420 F.3d 166, 173 (2d Cir. 2005)).

Here, temporal connection is not the only evidence offered by Mr. John regarding the connection between his protected activity and termination. Mr. John testified that his efforts to

return to work between June 17, 2020, and his voluntary dismissal on August 21, 2020 were affected, in part, by Ms. Cantore, Ms. Canales and Mr. Geloso not speaking with him because of him having counsel for the CHRO complaint. *See e.g.,* John Dep. 84:3–6 ("I was waiting for them to get back to me. And then Sophia got back to me and told me that I -- Laurie [sic] that since I had lawyer, I couldn't speak to her.").[10]

Furthermore, there is a genuine issue of fact as to whether Walmart's end-of-leave process was properly followed in Mr. John's case. *Compare* Canales Dep. at 19:1–7 ("Q: At some point, in time, he had or was close to exhausting the time permitted, right? A: Correct. Q: And he was supposed to have received a return to duty letter, right? A: That's something that the store would send. And also Sedgwick sends that automatically to them."), *with* John Dep. 84:13–85:9 ("Sophia said that it was filled -- Mike Geloso filled the position and that she would get back to me on Laurie [sic]. So I was just waiting. Then I got a letter in the mail for end of leave, which was inaccurate because as you can see on all the documents that you sent me that it's saying right here that I'm supposed to come back the 27th of June. So I'm supposed to receive an end of leave letter, because this is the end of my leave. I never received any end of leave letter. You're supposed to get that similar to the one they sent in August to say: Hey, your leave is coming  up, let's plan your return. And they did not, because Sophia was extremely new in her position -- in all positions there's a lot of stuff that we don't always know everything, which is understandable. But for them to fill my position and not send me an end of leave letter to do this,

---

[10] "[Federal] Rule [of Civil Procedure] 56(e) provides that affidavits in support of and against summary judgment shall set forth such facts as would be admissible in evidence. Therefore, only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009) (quoting *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997)). Ms. Cantore's statement is admissible at trial as a non-hearsay opposing party statement. *See* Fed. R. Evid. 801(d)(2)(D) (statements "made by the party's agent or employee on a matter within the scope of that relationship and while it existed" are not hearsay).

but they sent one in August saying that if I don't respond to this, I'm involuntarily terminated. They are supposed to send this in May.")

There is also a genuine dispute of material fact as to whether Defendants posted and filled Mr. John's position before or after he was voluntarily terminated. *Compare* Canales Aff. at ¶ 22 ("It was not until after Mr. John's employment was terminated in the system that Walmart began searching for candidates to replace Mr. John. Walmart eventually backfilled the Asset Protection Associate position vacated by Mr. John in November 2020.") *and* Geloso Aff. at ¶ 24 ("It was not until November of 2020 that we hired a new Asset Protection Associate for the Milford Store. The Search for that position did not start until after the "End of Leave" letter was issued to Mr. John.), *with* John Dep. at 82:5–10 ("Q: So, around June 20th or so, you have this conversation with Sophia: She tells you your position has been filled, you should look for another position within the store and that Lori [sic] Canalis [sic] can't talk to you because you have a lawyer? A: Yes."). *Cf. Nzugang v. Hutchinson Precision Sealing Sys., Inc.*, No. 3:21-cv-01567 (VAB), 2023 WL 4551377, *13 (D. Conn. July 14, 2023) ("[The plaintiff], however, can establish an inference of pretext if there were 'procedural irregularities' in the termination decision." (citing *March v. First Choice Med. PLLC*, No. 17-CV-4272 (RRM) (SIL), 2021 WL 3006043, at *13 (E.D.N.Y. July 15, 2021) (citing *Stern v. Trs. of Columbia Univ. in N.Y.C.*, 131 F.3d 305, 313 (2d Cir. 1997))).

The indirect temporal connection between the protected activity and his termination, combined with the disputes regarding the procedural irregularities of that termination allow Mr. John to carry his *de minimus* burden and establish a *prima facie* case that his termination was in retaliation for protected activity.

Having found that Mr. John can establish a *prima facie* case of retaliation, the burden of production now shifts and Defendants must "proffer a legitimate, non-discriminatory reason for its actions in order to rebut the presumption of unlawful discrimination." *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 52 (2d Cir. 1998) (citing *McDonnell Douglas*, 411 U.S. at 802, 93). "[W]hile the presumption shifts the burden of *production* to the defendant, [t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Hicks,* 509 U.S. at 506–07 (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981) (emphasis and alteration in original)). "If the defendant carries this burden of production, the presumption raised by the *prima facie* case is rebutted and drops from the case." *Id.* at 507 (internal citations and quotations marks omitted). Defendants, however, have produced no evidence sufficient to eliminate a genuine issue of material fact as to these disputes or the potential irregularities in their process.

Defendants argue that "Sophia Cantore, the personnel coordinator who supposedly misinformed plaintiff his job had been filled, was not the target of plaintiff's discrimination complaints, and there is no evidence suggesting she was even aware of plaintiff's activity." Reply at 6. But Defendants fail to "'clearly set forth, through the introduction of admissible evidence,' reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *Hicks*, 509 U.S. at 507 (citing *Burdine*, 450 U.S. at 254–55, n.8). Indeed, there is a genuine issue of material fact as to at whose direction Ms. Cantore was acting. *See* Canales Dep. at 20:17–23 ("Q: Okay. Now, what would make Ms. Cantore publish a job posting for Mr. John's job while he was on sick leave? Actively on sick leave? A: Okay, that – I mean, I don't – I mean, I can't answer whether

she was given direction or not from Mike Geloso at the time, or his physician had, or his leave had exhausted time. So, it depends on the situation.").

Defendants argue that: "[t]he belatedness of the end-of-leave letter is simply much ado about nothing. If anything, this allowed plaintiff additional time to explore asset protection or other opportunities in the Milford store or another location, something he neglected to do." Reply at 7. But the admitted "belatedness of the end-of-leave," why it happened, and its role in Mr. John's termination, if any, along with all of the other circumstances noted above, involve "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts . . . jury functions, not those of a judge." *Davis-Garett*, 92 F.3d at 46 (quoting *Reeves*, 530 U.S. at 150); *cf. id.* at 47 ("[W]ith respect to the retaliation claim, the district court appears not to have considered the record as a whole and plainly did not describe it in the light most favorable to [the plaintiff].").

As a result, there is a genuine issue of fact as to whether Mr. John's pending CHRO complaint played a role in his termination. *See id.* at 48 ("The factfinder of course would not be required to draw inferences favorable to the plaintiff or accept her testimony as credible; however, where . . . the factfinder would be permitted to do so, this Court in reviewing summary judgment must do so, and has done so here.") (citation omitted and internal quotation marks omitted)).

Accordingly, summary judgment is denied as to Mr. John's Title VII retaliation claim.

### D.  The State Law Claims

#### 1.  The Intentional Infliction of Emotional Distress Claim

Under Connecticut law, four elements must be established to prevail under a claim for intentional infliction of emotional distress: "(1) that the actor intended to inflict emotional

distress or that he knew or should have known that emotional distress was the likely result of his

conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was

the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff

was severe." *Appleton v. Bd. of Educ. of Town of Stonington*, 757 A.2d 1059, 1062 (Conn. 2000)

(internal quotation marks and citation omitted).

"Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme

and outrageous is initially a question for the court to determine. Only where reasonable minds

disagree does it become an issue for the jury." *Id.* (citations omitted). "The general rule is that

there is liability for conduct exceeding all bounds usually tolerated by a decent society, of a

nature which is especially calculated to cause, and does cause, mental distress of a very serious

kind." *Golnik v. Amato*, 299 F. Supp. 2d 8, 15 (D. Conn. 2003) (internal quotation marks and

citations omitted).

> Liability has been found only where the conduct has been so
> outrageous in character, and so extreme in degree, as to go beyond
> all possible bounds of decency, and to be regarded as atrocious, and
> utterly intolerable in a civilized community. Generally, the case is
> one in which the recitation of the facts to an average member of the
> community would arouse his resentment against the actor, and lead
> him to exclaim, "Outrageous!"

*Appleton*, 757 A.2d at 1062 (quoting 1 Restatement (Second), Torts § 46, cmt. (d), p. 73

(1965)).

Connecticut courts have been reluctant to allow claims for intentional infliction of

emotional distress, even in cases involving significant employment-related activities, and in

applying Connecticut law, federal courts in this District have interpreted the extreme and

outrageous requirement strictly. *See Golnick*, 299 F. Supp. 2d at 15-16 (collecting cases); *Lopez-*

*Salerno v. Hartford Fire Ins. Co.*, No. 3:97-cv-273, 1997 WL 766890, at *7 (D. Conn. Dec. 8,

1997) (same).

32

"There is no bright line rule to determine what constitutes extreme and outrageous conduct sufficient to maintain an action as the court must look to the specific facts and circumstances of each case in making its decisions." *Menon v. Frinton*, 170 F. Supp. 2d 190, 198 (D. Conn. 2001) (internal quotation marks and citation omitted). However, "[c]ertain principles have emerged in the context of employer/employee relationships which guide the analysis. A court evaluates whether '... the employer's conduct, not the motive behind the conduct, [is] extreme or outrageous.'" *Armstead v. Stop & Shop Cos., Inc.*, No. 3:01-cv-1489, 2003 WL 1343245, at *5 (D. Conn. Mar. 17, 2003) (citations omitted) (alterations in original). Thus, claims of employer misconduct that challenge motive or intent are dismissed unless the manifesting conduct is itself outrageous or extreme.

Mr. John argues that he suffered intentional infliction of emotional distress arising from the discrimination and retaliation to which he was subjected by the Defendants.

Defendants argue that this claim, "rests . . . on the same factual averments forming the foundation of his Title VII and Section 1981 discrimination and retaliation claims . . . . [and] will not do." Mem. at 16.

The Court agrees.

Mr. John's intentional infliction of emotional distress claim is based on Defendants' alleged improper motives for subjecting him to routine discipline or "coachings"; failing to hire him for promotional opportunities after he was granted interviews; and issuing a voluntary notice of termination after an extended medical leave. On this record, Mr. John has not provided a genuine issue of fact sufficient to meet the well-established standard for this claim under Connecticut law. *See, e.g.*, *Tracy v. New Milford Pub. Schs.*, 922 A.2d 280, 285–287 (Conn. App. Ct. 2007) (conduct not outrageous where supervisor conspired with superintendent in

33

pattern of harassment including denial of position, initiating disciplinary actions without proper investigation, defamation of character, and intimidation); *Armstrong v. Chrysler Fin. Corp.*, No. 3:97-cv-1557 (AHN), 1998 WL 342045, at *5, (D. Conn. May 14, 1998) (conduct by supervisor who "criticized, insulted, demeaned, and embarrassed [plaintiff] on a daily basis, took away her authority, frequently declared her incompetent, and demeaned her professional ability in the presence of her superiors and subordinates ... does not meet the required threshold of outrageousness"); *Valencia v. St. Francis Hosp. & Medical Ctr.*, No. CV 940538867S, 1996 WL 218760, at *8 (Conn. Super. Ct. Apr. 2, 1996) ("allegations that [supervisor] 'grabbed plaintiff's arm in front of patients and co-workers, pulled her in a back room and yelled at her' ... is insufficient to support" intentional infliction of emotional distress claim); *Lorenzi v. Connecticut Judicial Branch*, 620 F. Supp. 2d 348, 353 (D. Conn. 2009) ("Close supervision, the demeaning and unprofessional speech alleged by the plaintiff, unfair job appraisals, inferior office space, denial of pay raises and promotions, orders to limit interactions with certain other employees, insults about one's lunch, discrimination on the basis of race and/or national origin, and/or retaliating against an employee for complaining about such discrimination, do not meet the standard for finding that conduct was extreme and outrageous.").[11]

---

[11] In his submissions opposing the motions for summary judgment, Mr. John includes allegations that Mr. Smith subjected Ms. Trinidad to sexual harassment. *See, e.g.,* Trinidad Aff. at ¶ 7, ECF No. 113 (April 22, 2025) ("After a month or so, Ron Smith asset protection manager from Milford, Ct Walmart store was sent to my store to help with coverage. Ron Smith began working with myself and my partner Zane Fredricks. A week after Ron Smith covering my store, he started texting Zane that he was interested in getting to know me intimately outside of work. I told my partner Zane to tell him I was not interested at all. Ron did not stop. He continued to ask about me making things very awkward in my office. I was also told by multiple female associates in different Walmart stores in the company that Ron Smith would make sexual advances and overly aggressive towards women in every store he worked in. Examples of comments Ron Smith would say to me: '**The things I would do that**' with eyes on my specific body part being chest or butt. '**You don't know what you're missing girl**', after always being denied interest. '**You lead men on don't you, you look like the type**', when attempting to play victim when to try and spark conversation." (emphases in original)). Neither Ms. Trinidad nor Mr. White are parties to this lawsuit. Additionally, Mr. White's alleged treatment of Ms. Trinidad was not included in the Amended Complaint, and the Court therefore will not consider any such claims at the summary judgment stage. *See Mahmud v. Kaufmann*, 607 F.Supp.2d 541, 555 (S.D.N.Y.2009), *aff'd*, 358 Fed. App'x 229 (2d Cir. 2009). ("Generally, courts will not consider, on a motion for

As a result, no reasonable juror could conclude that the conduct alleged in this case can meet the high threshold of extreme and outrageous conduct.

Accordingly, summary judgment will be granted as to Mr. John's intentional infliction of emotional distress claim.

### 2. The Negligent Infliction of Emotional Distress Claim

To survive summary judgment on his negligent infliction of emotional distress claim, Mr. John must show that genuine issues of material fact exist with respect to all of the following elements: "(1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress." *Carrol v. Allstate Ins. Co.*, 815 A.2d 119, 127 (Conn. 2003).

Connecticut law recognizes a claim for negligent infliction of emotional distress in the employment context only where it is based on "unreasonable conduct of the defendant in the termination process." *Morris v. Hartford Courant Co.*, 513 A.2d 66, 69 (Conn. 1997). The termination of an employee, even for false reasons, cannot sustain a negligent infliction of emotional distress claim unless the employer does something out of the ordinary that "transgress[es] the bounds of socially tolerable behavior." *Parsons v. United Techs. Corp.*, 700 A.2d 655, 667 (Conn. 1997) (citation and internal quotation marks omitted); *Chieffalo v. Norden Sys., Inc.*, 714 A.2d 1261, 1265 (Conn. App. Ct. 1998) (affirming the grant of a motion for judgment notwithstanding the verdict on a negligent infliction of emotional distress claim because "[t]here was no evidence that the manner of the plaintiff's termination from employment

---

summary judgment, allegations that were not pled in the complaint and raised for the first time in opposition to a motion for summary judgment.").

was different in any way from the usual termination of employment or that it was done in any way that would cause anything more than the normal upset that would result from any termination of employment.").

Mr. John argues that his negligent infliction of emotional distress claim arises from the Defendants' discrimination and retaliation.

Defendants argue that they are entitled to summary judgment on Mr. John's negligent infliction of emotional distress claim because, first, most of the allegations involve non-actionable "'conduct occurring within a continuing employment context,' such as disciplinary actions, promotional denials, and alleged mistreatment," Mem. at 17 (*citing Moscony v. IDEXX Laboratories, Inc.*, No. 3:20-cv-821, 2024 WL 449611, at *5 (D. Conn. Feb. 6, 2024)), and, second, because the manner of Mr. John's termination "was in no way unreasonable." *Id.*

The Court agrees.

Conduct that occurred during the course of a plaintiff's employment, like the coachings or the failures to hire Mr. John for promotional opportunities, cannot support a negligent infliction of emotional distress claim. *See Perodeau v. City of Hartford*, 792 A.2d 752, 772 (Conn. 2002) (holding that an employer "may not be found liable for negligent infliction of emotional distress arising out of conduct occurring within a continuing employment context, as distinguished from conduct occurring in the termination of employment.").

As to Mr. John's termination process, there is nothing in this record that "transgress[ed] the bounds of socially tolerable behavior." *See Parsons*, 700 A.2d at 667; *Larobina v. McDonald*, 876 A.2d 522, 532 (Conn. 2005) (noting that the test for a negligent infliction of emotional distress claim requires "'the fear or distress experienced by the plaintiff[ ] be reasonable in light of the conduct of the defendants... [such that] the defendant[ ] should have

realized that [its] conduct created an unreasonable risk of causing distress, and [it], therefore, properly would be held liable.'") (quoting *Carrol*, 815 A.2d at 127). The termination process described by Mr. John involves telephone conversations and form letters—Mr. John did not allege that the conversations he had with Ms. Cantore were anything other than professional and within the "bounds of socially tolerable behavior." *Parsons*, 700 A.2d at 667.

Accordingly, summary judgment will be granted as to Mr. John's negligent infliction of emotional distress claim.

### 3. The Negligent Hire, Supervision, and Retention Claims

"A claim for negligent supervision establishes direct liability for an employer who fails to exercise reasonable care in supervising an employee." *Dumas v. The Price Chopper, Inc.*, No. WWMCV095004896S, 2010 WL 1889036, at *2 (Conn. Super. Ct. 201) (citing *Seguro v. Cummiskey*, 844 A.2d 224, 230 (Conn. App. Ct. 2004)). "To state a claim for negligent supervision, a plaintiff must plead and prove that he suffered an injury due to the defendant's failure to supervise an employee whom the defendant had a duty to supervise." *Abate v. Circuit-Wise, Inc.*, 130 F. Supp. 2d 341, 344 (D. Conn. 2001).

The employer owes a duty only if "the defendant knew or reasonably should have known of the employee's propensity to engage in that type of tortious conduct." *Id.* at 345 (citation omitted). "While no Connecticut case appears to spell out the elements of a claim for negligent supervision, it appears that such a claim must allege an injury in tort." *Deguzman v. Kramer*, No. 3:04-cv-2064 (JCH), 2005 WL 2030447, *2 (D. Conn. Aug. 23, 2005). "'Violations of Title VII, the ADEA, and CFEPA are insufficient bases' for satisfying the 'injury prong of a negligent supervision claim.'" *Antunes v. Lowe's Home Centers, LLC*, 2023 WL 122042, at *7 (D. Conn. Jan. 5, 2023) (quoting *Michalsky v. Moffly Publ'n, Inc.*, FSTCV196042420S, 2020 WL 5537003,

at *6 (Conn. Super. Ct. Aug. 13, 2020); *Canty v. Rudy's Limousine*, No. Civ.A.3:04cv1688 (CFD), 2005 WL 2297410, at *6 (D. Conn. Sept. 15, 2005) (holding that where the plaintiff "alleged no injury other than violations of Title VII, the ADEA, and CFEPA", these "violations are insufficient bases for a negligent supervision complaint").

Defendants argue that they are entitled to summary judgment on Mr. John's claims for negligent hiring and supervision because he does not allege injury beyond those of his Title VII claim, thus there is no independent injury in tort. Mem. at 18 (citing *Antunes*, 2023 WL 122042, at *7).

The Court agrees.

Mr. John does not allege that he suffered any tortious conduct beyond his allegations of racial discrimination, harassment, and unlawful retaliation. *See generally* Am. Compl. at ¶¶ 199–217. He thus is alleging no independent injury based on negligent supervision, hiring or retention. *See Antunes*, 2023 WL 122042, at *7; *Canty*, 2005 WL 2297410, at *6. Nor is there anything in this record which would support this claim.

Accordingly, summary judgment will be granted as to Mr. John's negligent hiring, supervision, and retention claim.

### 4. The Breach of the Covenant of Good Faith and Fair Dealing Claim

Implicit in every contract is a duty of good faith and fair dealing that neither party will do anything that will injure the right of the other party to receive the benefit of the agreement. *See Capstone Bldg. Corp. v. Am. Motorists Ins. Co.*, 67 A.3d 961, 986 (Conn. 2013) ("[I]t is axiomatic that the ... duty of good faith and fair dealing is a covenant implied into a contract or a contractual relationship.... In other words, every contract carries an implied duty requiring that neither party do anything that will injure the right of the other to receive the benefits of the

agreement...." (internal quotation marks omitted)). The essence of the good faith and fair dealing principle "is the fulfillment of the reasonable expectations of the parties." *Magnan v. Anaconda Indus., Inc.*, 479 A.2d 781, 789 (Conn. 1984).

Defendants argue that the implied covenant of good faith and fair dealing does not normally apply to at-will employment contacts, Mem. at 19–20 (citing *Mumma v. Pathway Vet Alliance, LLC*, 648 F.Supp.3d 373, 396 (D. Conn. 2023), and that, while a narrow exception applies for certain important public policy considerations, that exception does not apply since here Mr. John's alleged injuries could be remedied under Title VII and 42 U.S.C. § 1981. *See* Mem. at 20 (citing *Scaife v. City of Madison*, 493 F.Supp.3d 1, 15 (D. Conn. 2020)).

The Court agrees.

In general, the covenant of good faith and fair dealing does not apply to dismissal from at-will employment unless that dismissal violates some important public policy. *McKinstry v. Sheridan Woods Health Care Center, Inc.*, 994 F.Supp.2d 259, 267 (D. Conn. 2014) ("In order to state a claim for breach of the implied covenant of good faith and fair dealing, a plaintiff must allege 'a demonstrably *improper* reason for dismissal, a reason whose impropriety is derived from some important violation of public policy.'"(quoting *Morris v. Hartford Courant Co.*, 513 A.2d 66, 68 (Conn. 1986) (emphasis in original)). "But the exception is narrow and does not apply if an adequate statutory remedy exists by which the public policy violation can be enforced." *Scaife*, 493 F. Supp. 3d at 15 (citing *Burnham v. Karl and Gelb, P.C.*, 745 A.2d 178, 181 (2000)). Title VII and 42 U.S.C. § 1981 provide statutory remedies for Mr. John's claims of racial discrimination and retaliation—and he does not dispute that he was subject to an at-will employment contract. Therefore, his claims do not fall within the narrow exception to the general rule exempting such contracts from the covenant of good faith and fair dealing.

Accordingly, summary judgment will be granted as to Mr. John's breach of the implied covenant of good faith and fair dealing claim.

**IV.    CONCLUSION**

For the following reasons, Defendants' motion for summary judgment is **GRANTED in part** and **DENIED in part.**

Mr. John's claims under Title VII and 42 U.S.C. § 1981 alleging racial discrimination and all of his state law claims are dismissed. Only his Title VII claim for unlawful retaliation remains for trial.

**SO ORDERED** at New Haven, Connecticut, this 19th day of September, 2025.


/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE